**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 3, 2020**

# In the Court of Appeals of Georgia

A20A1253. JORDAN et al v. DEPARTMENT OF NATURAL RESOURCES, ENVIRONMENTAL PROTECTION DIVISION

PIPKIN, Judge.

Appellants Jen Jordan, Todd Smith, and Kim Baynes appeal the dismissal of their declaratory judgment action against Appellee Department of Natural Resources, Environmental Protection Division ("the EPD"), concerning a consent order entered into between the EPD and Sterigenics, U. S., LLC, an Atlanta-area business.[1] Because we conclude that a direct appeal is not the proper avenue by which to seek review of this ruling, we dismiss this appeal.

---

[1] Sterigenics is not a party to this action.

1. In 2018, elevated levels of airborne ethylene oxide ("EtO"), a known carcinogen, were detected in certain areas of metro Atlanta, and the chemical was linked to Sterigenics' medical-sterilization operations in Cobb County. In August 2019, the EPD entered into a Consent Order with Sterigenics in an effort to stem the release of EtO, whereby Sterigenics committed to take various steps to reduce EtO emissions from its facility. The consent order called for, among other things, Sterigenics to modify and renovate its facility to capture EtO and reduce emissions within a specified time frame. For reasons that have never been explained, the EPD finalized the consent order without any public notice or input.

In September 2019, Appellants, who live in the vicinity of the facility, filed a complaint for declaratory relief, see OCGA § 50-13-10, asserting that the August 2019 Consent Order was invalid because it was issued before the requisite notice and comment period. See Ga. Comp. R. & Regs. r391-1-3-.01 (2). In response, the EPD moved to dismiss, arguing that Appellants' complaint failed to state a claim under OCGA § 50-13-10 and, consequently, failed to identify a means of overcoming sovereign immunity. The trial court agreed with the EPD and granted the motion, concluding that a declaratory judgment was improper because parties' rights had

2

already accrued, and there was no future uncertainty for either party. Appellants thereafter filed a timely notice of appeal.

2. We first consider the EPD's motion to dismiss. In its motion, the EPD argues that Appellants are not entitled to a direct appeal from the dismissal of the petition for declaratory relief, but, instead were required to follow the application for discretionary appeal procedures laid out in OCGA § 5-6-35. For the reasons that follow, we agree and grant the motion.[2]

(a)    OCGA § 5-6-35 (a) (1) requires an application to appeal from "decisions of the superior court reviewing *decisions* of . . . state and local administrative agencies[.]" (Emphasis supplied.) Although the word "decisions" is not defined in OCGA § 5-6-35, our Supreme Court has interpreted the word in this context to mean an agency "determination of an adjudicative nature." *State v. Intl. Keystone Knights of the Ku Klux Klan, Inc.*, 299 Ga. 392, 402 (4) (a) (788 SE2d 455) (2016). A decision is of an adjudicatory nature if it is "immediate in application, is specific in application, and commonly involves an assessment of facts about the parties and their

---

[2] We do not mean to be understood that Appellants' claim lacks merit; indeed, as we conclude below, there is no concern that Appellants lacked standing to challenge EPD's apparent disregard of its own regulations. Instead, we simply conclude that Appellants were required to seek appellate review by means of an application.

3

activities, businesses, and properties." (Citation and punctuation omitted) *Wolfe v. Bds. of Regents of the Univ. System of Ga.*, 300 Ga. 223, 228 (2) (b) (794 SE2d 85) (2016). This is in contrast to agency determinations that are "quintessentially executive in nature" such as "the day-to-day management of agency personnel and resources, the dissemination of information to the public, the undertaking of law enforcement and compliance investigations, and prosecutorial determinations to initiate or decline to bring enforcement proceedings." *Keystone Knights*, 299 Ga. at 400-401 (4) (a).

Likewise, the term "decisions" in this context does not refer to agency determinations that are legislative in nature, which have been described as "prospective in application, general in application, and often marked by a general factual inquiry that is not specific to the unique character, activities or circumstances of any particular person." (Citation omitted.) Id. at 401 (4) (a). "[W]hen we consider the nature of the proceedings in the superior court for the purposes of OCGA § 5-6-35 (a) (1), we look to the substance of those proceedings, not merely the form of the relief sought." Id. at 407 (4) (b).

Here, Appellants are using a declaratory judgment action to challenge the August 2019 Consent Order and to have it declared invalid because the EPD did not

offer the requisite notice and comment period. . The consent order was an agreement reached by the relevant parties and signed by the Director of the Environmental Protection Division. The order pertains specifically and solely to Sterigenics' Air Quality permit and to Sterigenics' release of EtO (among other chemicals); the order recognizes Sterigenics' willingness to voluntarily take various corrective actions and imposes a time line for Sterigenics to undertake such actions. In sum, this consent order is immediate and specific in its application, and it involves an assessment of Sterigenics' activities, business, and properties, all of which are key features of an adjudicative decision. The fact that the consent order is not necessarily "marked by formal adjudicative procedures" does not control our analysis, *Keystone Knights*, 299 Ga. at 404; we note that the EPD is actually expected to seek voluntary resolution of possible noncompliance with the statutes and regulations it is tasked with enforcing, See, e.g., OCGA § 12-2-2 (c) (6) and 12-9-6 (b) (14).

It also cannot be said that this consent order amounts to the prospective, general rule making that would fall within the realm of legislative action; indeed, the consent order does not announce a general policy concerning EtO or the facilities that emit it. See *Keystone Knights*, 299 Ga. at 400-401 (4) (a). Likewise, the consent order was not, as urged by Appellants, an executive act. The consent order does not involve

5

the day-to-day operations of the agency, and it is not merely a determination to exercise investigative or prosecutorial discretion. Instead, the consent order is the result and resolution of such discretion; indeed, by its own terms, the consent order plainly "resolves the issues in this case by agreement."[3] See *United States v. ITT Continental Baking*, 420 U. S. 223, 238 (95 SCt 926, 43 LE2d 148) (1975) (discussing nature of administrative consent orders and recognizing that such orders are a mixture of contract and judicial decree, bringing about cessation to litigation).

(b)    However, the fact that the subject matter underlying this action is an agency decision of an adjudicative nature does not alone resolve whether this appeal should have been pursued by means of an application.

_____

[3] That Appellants contest the *procedure* by which the EPD approved the consent order does not alter our conclusion that this appeal involves a "decision" of a state agency. See *Augusta-Richmond County v. Lee*, 277 Ga. 483, 483 (592 SE2d 71) (2004) (challenge to the denial of a retail package license on basis that it was "arbitrary and capricious and not based on specific, objective criteria contained in the Augusta-Richmond County Code" involved a "decision" necessitating an application to appeal); *Prison Health Svcs. v. Georgia Dept. of Admin. Svcs.*, 265 Ga. 810 (462 SE2d 601) (1995) (disgruntled bidder objecting to agency recommencing bid process and claiming, among other things, constitutional and due process deprivations was a challenge to agency decision necessitating application to appeal); *Gurley v. Gordon County Bd. of Ed.*, 231 Ga. App. 481, 481 (498 SE2d 64) (1998) (challenge to letter of reprimand in superior court on the basis that school board had failed to comply with the open meetings act involved an agency decision necessitating compliance with OCGA § 5-6-35). Indeed, the relief requested by Appellants is that the consent order be deemed "invalid."

> As the [Georgia] Supreme Court [has] observed, the clear intent of OCGA § 5-6-35 (a) (1) was to give the appellate courts the discretion not to entertain an appeal when two tribunals had already adjudicated the case, such as occurs when a superior court sits in an appellate capacity and reviews a decision of . . . a state administrative agency.

(Citation omitted). *Best Tobacco v. Dept. of Revenue*, 269 Ga. App. 484, 485 (269 SE2d 578) (2004). See also *Citizen & Southern Nat. Bank v. Rayle*, 246 Ga. 727, 730 (273 SE2d 193) (1980). As such, the "rationale for requiring a discretionary application does not apply where the person who seeks to appeal was not a party to the administrative proceedings" at issue. *Ladzinske v. Allen*, 280 Ga. 264, 265 (626 SE2d 83) (2006). Georgia courts look "to the 'parties' in the administrative proceedings below . . . in the generic sense of whether the challenger participated in the administrative proceedings at issue (or could have participated but purposely did not)." (Punctuation omitted.) *Hamryka v. City of Dawsonville*, 291 Ga. 124, 126 (3) (728 SE2d 197) (2012). Accordingly, this portion of our analysis turns on whether Appellants "had standing to participate" in some level of administrative proceedings before filing their declaratory judgment action in the superior court. *Ladzinske*, 280 Ga. at 265.

7

Here, we begin our standing analysis by looking to the relevant statutory provisions. See *Ladzinske*, 280 Ga. at 265-266 (examining standing based on relevant ordinance permitting appeal to zoning board of appeals); see also *Ritchie v. Simpson*, 170 F3d 1092, 1095 (Fed. Cir. 1999) ("[T]he starting point for a standing determination for a litigant before an administrative agency is not Article III, but is the statute that confers standing before that agency.").

OCGA § 12-2-2 (c) (2) (A) provides as follows:

Any person who is aggrieved or adversely affected by any order or action of the director shall, upon petition to the director within 30 days after the issuance of such order or the taking of such action, have a right to a hearing before an administrative law judge of the Office of State Administrative Hearings . . . acting in place of the Board of Natural Resources.

Id. That code section provides additional detail on standing, explaining as follows:

Persons are "aggrieved or adversely affected" . . . where the challenged action has caused or will cause them injury in fact and where the injury is to an interest within the zone of interests to be protected or regulated by the statutes that the director is empowered to administer and enforce.

OCGA § 12-2-2 (c) (3) (A). The plain-language standing requirements of this statute, although not extensively explored by Georgia courts, are materially identical to the

two-part "zone of interest" test articulated by the United States Supreme Court in *Assn. of Data Processing Svc. Organizations v. Camp*, 397 U. S. 150, 153-154 (90 SCt. 827, 25 LE2d 184) (1970), and adopted by our Supreme Court in *Amdahl v. Georgia Dept. of Admin. Svcs.*, 260 Ga. 690 (398 SE2d 540) (1990). Under this two-fold test, consistent with the language of OCGA § 12-2-2 (c) (3) (A), "a complainant has standing if the complainant alleges that the challenged action has caused him injury in fact and if the complainant is asserting an interest arguably within the zone of interests to be protected by the statute." (Citation and punctuation omitted.) *Amdahl*, 260 Ga. at 696. We evaluate standing based on the Appellants' complaint. Id. See also *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F3d 1263, 1275 (11th Cir. 2003).

(i) We first look to whether Appellants have alleged an injury-in-fact.[4] In their complaint, Appellants aver that EtO, a known carcinogen, endangers human health; they also allege that the Sterigenics facility is known to emit EtO at levels posing a danger to those in proximity to the facility. Appellants claim to live near the facility in areas that "have or are likely to have heightened levels" of EtO. Appellants further aver that they are likely inhaling the airborne EtO through respiration and that long-term exposure poses elevated cancer risks . Some Appellants allege that they have significant underlying medical conditions – such as cancer – and suggest that those medical conditions may be a direct result of EtO exposure or, at the least, are exacerbated by such exposure . Appellants' claims are not merely overwrought speculation. The August 2019 consent order recognizes that EtO is a carcinogen and,

---

[4] The "injury in fact" standard is a reference to Article III standing. See *Center for a Sustainable Coast, Inc. v. Turner*, 324 Ga. App. 762, 764-765 (751 SE2d 555) (2013). Where, like here, the allegation is one of "procedural injury," the injury-in-fact requirements are more relaxed. See *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 572 & n.7 (IV) (112 SCt 2130, 119 LE2d 351) (1992). Compare *Sustainable Coast*, 324 Ga. App. at 767 n.2. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U. S. 497, 517-518 (IV) (127 SCt 1438, 167 LE2d 248) (2007).

further, that two census tracks located close to the Sterigenics facility had been identified as having "potentially elevated cancer risks" due to the EtO emissions.

Appellants claim that the emissions level proposed in the consent order will "still exceed[] the acceptable annual risk level by 12 to 24 times" under state guidelines, thus posing a continued and ongoing danger. Appellants also claim that the EPD acted without first affording residents notice and an opportunity to comment. According to Appellants, had they been afforded notice of the proposed consent order and an opportunity to comment, they would have "vocally contested" the consent order . They also contend that they would have challenged the scientific conclusions underlying the consent order, challenged any proposal that continued to allow the emission of EtO in their area, and detailed their various medical conditions that could have been caused or aggravated by EtO . These allegations are sufficient to establish an injury-in-fact here. See *New York Public Interest Research Group v. Whitman*, 321 F3d 316, 324-326 (II) (B) (2nd Cir. 2003) (allegations of increased health-related uncertainty due to exposure to air pollution sufficient injury-in-fact to confer standing); *Sierra Club v. EPA*, 774 F3d 383, 392-393 (II) (B) (7th Cir. 2014) (increased probability of injury resulting from elevated ozone levels in specific areas of St. Louis following administrative decision on air quality sufficient injury-in-fact)*;*

*Hall v. Norton*, 266 F3d 969, 976 (9th Cir. 2001) ("It follows that evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing."); *Sierra Club v. EPA*, 964 F3d 882, 888 (IV) (B) (10th Cir. 2020) ("The alleged health risks and diminished visibility [due to air pollution] constitute an injury-in-fact."); *Sierra Club v. EPA*, 129 F3d 137, 139 (DC Cir.1997) (increase in auto emissions in certain areas following administrative decision sufficient injury-in-fact).

(ii) We now turn to the second prong, whether "the complainant is asserting an interest arguably within the zone of interests to be protected by the statute." *Amdahl*, 260 Ga. at 696. The Unites States Supreme Court has expressed that it "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U. S. 209, 225 (III) (132 SCt 2199, 183 LE2d 211) (2012). This "test is not meant to be especially demanding," but, instead, is designed to deny review where a party's interests are "marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Securities Indus. Assoc.*, 479 U. S. 388, 399 (II) (107 SCt 750, 96 LE2d 757) (1978).

The basis of the August 2019 consent order is "The Georgia Air Quality Act." See OCGA § 12-9-1 et seq. The Act aims to

> preserve, protect, and improve air quality . . . to prevent the significant deterioration of air quality and to attain and maintain ambient air quality standards so as to safeguard the public health, safety, and welfare consistent with providing for maximum employment and full industrial development of the state.

OCGA § 12-9-2. Generally speaking, the EPD is tasked with the administration and enforcement of the Act, see OCGA § 12-9-4, and, further, the EPD is also generally required to "provide notice and opportunity to the public to comment and provide information regarding the proposed issuance of such orders,"[5] Ga. Comp. R. & Regs. r 391-1-3-.01 (2). Here, Appellants' alleged injury is the result of continuing EtO emissions and the EPD's failure to comply with the notice and comment provision.[6]

---

[5] There has been no suggestion that the notice and comment requirement does not apply in this instance.

[6] As quoted above, OCGA § 12-2-2 (c) (2) (A) generally provides a 30-day window in which a party who is "aggrieved or adversely affected" by an EPD order may seek an administrative hearing. There has been no argument that EPD's failure to comply with the notice and comment regulation somehow hampered – or tolled – the time frame in which Appellants could have sought an administrative appeal. Indeed, there is nothing to suggest when or how Appellants learned of the consent order, but the record reflects that Appellants filed their declaratory judgment action on the 31st day after the EPD finalized the consent order.

It is clear that the complaint asserts injuries that fall within the zone of interests protected by the relevant statutes and regulations.[7] See *United States v. Students Challenging Regulatory Agency Procedures*, 412 U. S. 669, 686 n.13 (93 SCt 2405, 37 LE2d 254) (1973) ("environmental interest" that petitioners sought to protect undoubtedly within the interests to be protected by National Environmental Policy Act of 1969); *Hall*, 266 F3d at 975 n.5 (agency's failure to adequately consider increased pollution that will result from land exchange plainly within the zone of interest protected by environmental statutes); *Ouachita Watch League v. Jacobs*, 463 F3d 1163, 1173 (11th Cir. 2006) (plaintiff's alleged environmental injury associated with forest service's failure to comply with certain environmental statutes fell within zone of interest protected by environmental statutes).

Accordingly, we conclude that Appellants were required to follow the application procedures provided in OCGA § 5-6-35, and, having failed to do so, this appeal must be dismissed. See *Keystone Knights*, 299 Ga. at 408.

*Appeal dismissed. Barnes, P. J., and Gobeil, J., concur*.

---

[7] Such a conclusion is bolstered by recent amendments to OCGA § 12-9-6, which now requires the EPD to "make publicly available on the division's website information regarding any spill or release of ethylene oxide reported to the division[.]" OCGA § 12-9-6 (b) (8) (effective January 1, 2021).